IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
COLUMBIA DIVISION

| | | |
|---|---|---|
| Jefford Henry, Jr., n/k/a Malik Abdul Bey, | ) ) | C/A No.: 3:10-2800-MBS-SVH |
| | ) | |
| Plaintiff, | ) ) | |
| vs. | ) ) | REPORT AND RECOMMENDATION |
| Rexam Beverage Can of North America, | ) ) | |
| Defendant. | ) ) | |

In this employment discrimination case, the *pro se* plaintiff, Jefford Henry, Jr.,

now known as Malik Abdul Bey ("Plaintiff"), is suing his former employer Rexam

Beverage Can of North America ("Defendant"). Plaintiff alleges race, age, and religion

discrimination claims pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. §

2000e, et seq. ("Title VII"). Plaintiff's complaint may also be liberally construed to state

a claim of retaliation under Title VII.

This matter comes before the court on the motion for summary judgment filed by

Defendant on January 17, 2012. [Entry #54]. On January 18, 2012, the court issued an

order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Plaintiff

of the summary dismissal procedure and possible consequences if he failed to adequately

respond to the motion for summary judgment. [Entry #55]. Plaintiff filed a response to

the motion on February 10, 2012 [Entry #59][1], and Defendant's deadline for filing a reply

_____

[1] Plaintiff's response does not substantively address any arguments raised in
Defendant's motion. Rather, Plaintiff argues that summary judgment should not be

has passed. This motion for summary judgment having been fully briefed, it is ripe for disposition.

All pretrial proceedings in this case were referred to the undersigned pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Local Civil Rule 73.02(B)(2)(g) (D.S.C.). Because the motion for summary judgment is dispositive, this report and recommendation is entered for the district judge's consideration. For the reasons that follow, the undersigned recommends the district court grant the motion for summary judgment.

I.      Factual and Procedural Background

Plaintiff is an African-American male who was 52 years old at the time he filed the complaint in this matter. [Entry #1 at ¶ 6]. He began working for Defendant, a manufacturer of aluminum beverage cans, in February 1981. [Entry #54-2 at 4]. Defendant's plant operates on a 24-hour, 7-days-a-week schedule. [Entry #54-4 at 10]. Employees at the plant are represented by the United Steelworkers of America ("Union"), and the employer/employee relationship is governed by a collective bargaining agreement ("CBA") between Defendant and the Union. [Entry #54-3 at 2]. Defendant maintains a no-fault attendance policy under which employees receive one point for being absent a full day and partial points for being absent a portion of the day. *Id.* at 8. An employee

---

granted during the discovery period. [Entry #59 at ¶ 2]. Pursuant to the court's order of October 19, 2011 [Entry #44], discovery ended on November 17, 2011. As such, Plaintiff's assertion that Defendant's motion for summary judgment should not be ruled on during the discovery period is unavailing.

who accumulates six points in a twelve-month period is subject to termination. *Id.* at 8–9.

Plaintiff worked a rotating schedule of four days on and four days off. [Entry #54-4 at 10]. He was regularly scheduled to work every other Saturday. *Id.* During his employment, Plaintiff worked on the palletizer, in the spray room, in the bailer room, and rebuilding anchors. [Entry #54-2 at 4–5]. At the time of his discharge, Plaintiff was working as a front end maintainer, primarily serving as a mechanic on the machines used on the front end of Defendant's production process. *Id.* at 5.

Plaintiff joined the Holiness church in 1992. *Id.* at 7. In or around 2003, Plaintiff started having a conviction that he should not work on Saturdays in order to observe the Sabbath. *Id.* at 8. Prior to that time, Plaintiff worked on Saturdays. *Id.* To observe other religious days, Plaintiff also requested a total of fifteen additional non-Sabbath days off during the year. [Entry #54-4 at 11].

On March 25, 2005, Plaintiff received a three-day suspension for having more than four attendance infractions within a one-year period. [Entry #54-3 at 11]. He was notified that if he received two more full infractions with the same year, he would be issued a six-day suspension with intent to discharge. *Id.* Plaintiff filed a grievance with the Union and Defendant met with the Union on April 29, 2005. *Id.* at 13. Plaintiff's grievance was resolved by Defendant agreeing to an accommodation allowing Plaintiff to utilize trade days to arrange to be off on Saturdays. *Id.* Defendant also agreed to reduce Plaintiff's suspension to a verbal warning. *Id.*

The accommodation was initially successful. Plaintiff traded shifts with other employees, paying them $100 per Saturday shift. [Entry #54-2 at 10]. Plaintiff continued paying for trades even after the plant manager told him that doing so was against company policy. *Id.* at 11. He ultimately stopped paying other employees for trades, but cannot recall the time period. *Id.* at 11–12. Defendant states that some employees stopped trading shifts when they realized that if they agreed to a trade, they were paid straight time pay. [Entry #54-4 at ¶ 8]. If they were called in by management to cover a shift, however, they received premium overtime pay. *Id.* According to Defendant, other employees simply grew tired of working every Saturday and stopped agreeing to trade shifts with Plaintiff. *Id.*

On September 25, 2006, Plaintiff was again disciplined for attendance issues. [Entry #54-3 at 15]. He was given a six-day suspension "pending determination by the Company with intent to discharge." *Id.* Plaintiff filed a grievance regarding his discharge that proceeded to arbitration. Pursuant to the CBA, Plaintiff was permitted to continue working at the plant until his grievance was resolved.[2] [Entry #54-3 at 23].

At the October 12, 2007 arbitration hearing, the Union proposed two possible accommodations for Defendant to consider. [Entry #54-4 at 18–19]. First, the Union proposed Defendant allow Plaintiff to take vacation days in single increments to cover his

---

[2] Although Plaintiff asserts in his complaint that he was "hired back to work" after the October 12, 2007 hearing, this assertion is unsupported by the record. [Entry #1 at 2]. Plaintiff also contends "an arbitration decision on the hearing was issued April 2, 2008, whereby it was decided that I would be able to have Sabbath off (I observe the Sabbath from sundown Friday until sundown Saturday) and work without further attendance issues." *Id.* This assertion is contradicted by the arbitrator's written decision. [Entry #54-4 at 18].

absences.  *Id.* at 19.  Second, the Union proposed Plaintiff be moved to an Inker Rebuilder position where his work schedule did not include Saturdays.  *Id.*

After Defendant had an opportunity to consider the reasonableness of the two proposed accommodations, a second arbitration hearing was held on February 1, 2008. *Id.*  The arbitrator found that allowing Plaintiff to take vacation days on Saturdays would require Defendant to supercede seniority when scheduling vacations (a violation of the CBA), would unfairly burden other employees, and would be ineffective in that Plaintiff did not have sufficient vacation days to cover the Sabbath days and other religious holidays.  *Id.* at 36–37.  With regard to the proposal that Plaintiff be transferred to the position of Inker Rebuilder, the arbitrator held it was a reasonable accommodation to allow Plaintiff to bid for the position when it became available.  *Id.* at 39.  The arbitrator went on to state that if Plaintiff was found unqualified for the position, however, the proposed accommodation would be void.  *Id.* at 40.  Finding that Defendant had met its legal obligation to provide Plaintiff with a reasonable accommodation, the arbitrator denied Plaintiff's discharge grievance.  *Id.*

Plaintiff subsequently bid on the Inker Rebuilder position, but the position was awarded to another employee whom Defendant contends was the most qualified candidate.  *Id.* at 7.  Because Plaintiff was not awarded the position, the intended employment termination referenced in the September 25, 2006 suspension was put into effect.  [Entry #54-3 at 15].  Plaintiff filed a charge with the South Carolina Human Affairs Commission ("SCHAC") on August 15, 2008 [Entry #54-3 at 19], and filed this lawsuit on October 28, 2010.  [Entry #1].

## II. Discussion

### A. Standard of Review

The court shall grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial burden of demonstrating that summary judgment is appropriate; if the movant carries its burden, then the burden shifts to the non-movant to set forth specific facts showing that there is a genuine issue for trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact cannot be disputed, it must support that assertion either by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

A federal court must liberally construe pleadings filed by pro se litigants, to allow them to fully develop potentially meritorious cases. *See Cruz v. Beto*, 405 U.S. 319

(1972), and *Haines v. Kerner*, 404 U.S. 519 (1972). The requirement of liberal construction does not mean that the court can ignore a clear failure in the pleadings to allege facts which set forth a federal claim, *Weller v. Dep't of Soc. Servs.*, 901 F.2d 387 (4th Cir. 1990), nor can the court assume the existence of a genuine dispute of material fact where none exists. If none can be shown, the motion should be granted. Fed. R. Civ. P. 56(c).

> B.     Analysis

>> 1.     Religious Discrimination Claim

>>> a.     Timeliness of SCHAC Charge

Defendant argues Plaintiff did not timely file his SCHAC charge and that his religious discrimination claim should be denied on that basis. [Entry #54-1 at 13]. In support of its argument, Defendant states that Plaintiff was informed his employment was being terminated in September 2006 and that Plaintiff believed at that time that the discharge was discriminatory in nature. *Id.* Plaintiff, however, did not file a charge of discrimination with SCHAC until August 2008, which Defendant argues was well past the 300-day deadline proscribed by statute. *Id.*

To initiate a claim under Title VII, a plaintiff is first required to exhaust his administrative remedies. Title VII requires that a claimant file a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") within 180 days of the alleged discriminatory act or acts, or, if the alleged discrimination occurred in a "deferral state," within 300 days from the alleged discriminatory act or acts if the claimant initially institutes proceedings with the appropriate state agency, or within 30 days of the state

agency's termination of its proceedings, whichever is earlier. *See* 42 U.S.C. § 2000e–5(e). It is undisputed that South Carolina is a deferral state, and that the Plaintiff could therefore file his administrative claim with SCHAC. *Nelson v. Lockheed Missiles and Space Co.*, No. 97-1430, 1997 WL 727609, at *1 n.1 (4th Cir. Nov. 24, 1997); *E.E.O.C. v. Hansa Prods., Inc.*, 844 F.2d 191, 192 n.1 (4th Cir. 1988); *see* S.C. Code Ann. § 1-13-90, *et. seq.*, as amended.

Plaintiff's SCHAC charge identifies two allegedly-discriminatory adverse employment actions: denial of a lateral transfer and discharge. [Entry #54-3 at 19]. Defendant contends the date to be used in calculating Plaintiff's EEOC filing deadline is September 25, 2006, the date Plaintiff was informed of his six-day suspension and Defendant's intent to terminate him. [Entry #54-1 at 11]. Defendant's briefs do not address the timeliness of Plaintiff's allegations regarding his denial of the lateral transfer, which allegedly occurred in April 2008. Because Plaintiff asserts two separate discriminatory acts in his SCHAC charge, the undersigned analyzes the timeliness of the charge with respect to each allegedly discriminatory act. *See Williams v. Giant Food Inc.*, 370 F.3d 423, 429 (4th Cir. 2004) (citing *Nat'l Passenger R.R. Corp. v. Morgan*, 536 U.S. 101 (2003), which holds that "an employee must file a charge of discrimination within the appropriate limitations period as to each discrete act of discrimination that occurred").

(1)     Timeliness of Wrongful Discharge Claim

Plaintiff testified at deposition that he was told he was being terminated in September 2006 and believed at that time that he was being terminated because of his

religious beliefs. [Entry #54-2 at 13]. Although Plaintiff contends in his complaint that he was "hired back to work" following the October 12, 2007 arbitration hearing, he testified that no one at the company ever gave him any indication that the company had changed its mind and that he was not going to be fired. [Entry #54-2 at 14]. Plaintiff continued to work after September 2006 because the CBA required that he "be retained at or returned to active work" until any grievance contesting his discharge was "finally resolved through the grievance and arbitration procedure." [Entry #54-3 at 4].

The Supreme Court has held in a factually-similar case that participation in a collectively-bargained grievance procedure does not toll the limitations period for bringing a Title VII charge. *See Int'l Union of Elec., Radio and Mach. Workers, AFL-CIO, Local 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 235–36 (1976); *see also Foleno v. Norfolk S. Ry. Co.*, No. 2:06-39, 2006 WL 2918946, at *3 (W.D. Va. Oct. 11, 2006). The grievance procedure is simply a mechanism to reconsider the decision to terminate an employee. *See Del. State Coll. v. Ricks*, 449 U.S. 250, 261 (1980); *Local 790*, 429 U.S. at 235–36. Furthermore, the Supreme Court has held that "entertaining a grievance . . . does not suggest that the earlier decision was in any respect tentative. The grievance procedure, by its nature, is a *remedy* for a prior decision, not an opportunity to *influence* that decision before it is made." *Del. State Coll.*, 449 U.S. at 261 (emphasis in original). In addition, for a Title VII claim of discriminatory firing, the running of the limitations period starts when the person was informed that he was being fired, even if the impacts of that decision were not felt until later. *See id.* at 258. In other words, "[t]he proper focus is upon the time of the *discriminatory acts,* not upon the time at which the *consequences*

of the acts became most painful." *Id.* at 258 (quoting *Abramson v. Univ. of Haw.*, 594 F.2d 202, 209 (9th Cir. 1979)) (emphasis added).

The Fourth Circuit also has held that the date upon which a person is informed of an allegedly discriminatory employment decision is the date from which the limitations period begins to run, regardless of when the impacts are felt. *See Price v. Litton Bus. Sys., Inc.*, 694 F.2d 963, 965 (4th Cir. 1982). Furthermore, the Fourth Circuit has stated that "as a matter of law . . . the attempt to mitigate the harshness of a decision terminating an employee, without more, cannot give rise to an equitable estoppel." *Id.* at 965. Equitable estoppel will not toll the limitations period unless the employee's delay in filing was the result of deliberate action by the employer or action that the employer "should unmistakably have understood would cause the employee to delay filing his charge." *Id.* at 965. Mere hope for rehire or some sort of continuing relationship with the company is not enough to toll the limitations period. *See id.* at 965–66.

While courts may apply equitable doctrines in Title VII cases, they are to be used sparingly. *Nat'l Passenger R.R. Corp.*, 536 U.S. at 113. In Title VII actions, generally the burden of proof is on the plaintiff to show that equitable tolling principles apply to excuse untimely filing of an EEOC charge. *See Ramirez v. City of San Antonio*, 312 F.3d 178, 183 (5th Cir. 2002); *Carter v. West Publ'g. Co.*, 225 F.3d 1258, 1265 (11th Cir. 2000). Here, Plaintiff has failed to respond in any way to Defendant's argument that the EEOC charge was untimely, has not provided any reason for the delay, and has not made any argument in support of tolling.

The termination decision was made and communicated to Plaintiff as of September 25, 2006. Based on the foregoing, the limitations period for filing the EEOC charge is not subject to tolling and ran in July 2007. Plaintiff filed his EEOC charge on August 15, 2008. The undersigned finds that Plaintiff's EEOC charge with respect to his claim of wrongful termination was untimely and recommends the district court grant defendant's motion for summary judgment as to the wrongful termination claim on that basis.

(2)     Timeliness of Denial of Lateral Transfer Claim

Plaintiff's SCHAC charge also complains that he was denied a lateral transfer in April 2008 when Defendant allegedly gave the job of Inker Rebuilder to a less senior, less qualified applicant. [Entry #54-3 at 19]. Plaintiff filed his SCHAC charge on August 15, 2008, within 300 days of the April 2008 adverse employment action alleged. The undersigned therefore finds that Plaintiff's SCHAC charge with respect to his denial of the lateral transfer was timely.

b.     Reasonableness of Accommodations

Even assuming the timeliness of the entirety of Plaintiff's SCHAC charge, Plaintiff cannot demonstrate he was denied a reasonable accommodation ultimately resulting in his termination. Title VII makes it an "unlawful employment practice for an employer . . . to discharge any individual . . . because of such individual's . . . religion." 42 U.S.C. § 2000e-2(a)(1) (2000). "[S]omewhat awkwardly," Congress "illuminate[d] the meaning of religious discrimination" by how it defined "religion" for the purposes of Title VII. *Ansonia Bd. of Educ. v. Philbrook,* 479 U.S. 60, 63 n. 1 (1986). Specifically, §

2000e(j) provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Thus, an employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." *Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 75 (1977).

In religious accommodation cases, the court employs a burden shifting scheme akin to the one articulated by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *E.E.O.C. v. Firestone Fibers & Textiles Co.*, 515 F.3d 307, 312 (4th Cir. 2008). A plaintiff must first establish a prima facie claim by showing that "(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement." *Chalmers v. Tulon Co. of Richmond*, 101 F.3d 1012, 1019 (4th Cir. 1996) (quoting *Philbrook v. Ansonia Bd. of Educ.*, 757 F.2d 476, 481 (2d Cir. 1985), *aff'd on other grounds*, 479 U.S. 60 (1986)).

"If the employee establishes a prima facie case, the burden then shifts to the employer to show that it could not [reasonably] accommodate the plaintiff's religious needs without undue hardship." *Chalmers*, 101 F.3d at 1019; *see also* 42 U.S.C. § 2000e(j). This is a two-prong inquiry. *Firestone Fibers*, 515 F.3d at 312. To satisfy its burden, the employer must demonstrate *either* "(1) that it provided the plaintiff with a

reasonable accommodation for his or her religious observances *or* (2) that such accommodation was not provided because it would have caused an undue hardship—that is, it would have result[ed] in more than a *de minimis* cost to the employer." *Id.* (quoting *Philbrook*, 479 U.S. at 67) (internal quotation marks omitted).

Thus, as the *Firestone Fibers* court explained:

> [I]f an employer has provided a reasonable accommodation, we need not examine whether alternative accommodations not offered would have resulted in undue hardship. *Philbrook*, 479 U.S. at 68, 107 S.Ct. 367. In fact, "where the employer has already reasonably accommodated the employee's religious needs, the statutory inquiry is at an end." *Id.* This is because "the statute directs that any reasonable accommodation by the employer is sufficient to meet its accommodation obligation." *Id.* Moreover, the employer need not provide the employee with his or her preferred accommodation. *See id.* (finding no basis "for requiring an employer to choose any particular reasonable accommodation"). Rather, so long as the employer has offered a reasonable accommodation, it has fulfilled its duty under Title VII. *See id.* at 68-69, 107 S.Ct. 367.

*Firestone Fibers*, 515 F.3d at 312–13.

Plaintiff has made a prima facie showing of religious discrimination. Plaintiff asserts that he is a member of the Holiness church and, as such, he cannot work from sundown Friday to sundown Saturday in observance of the Sabbath despite his job regularly requiring him to work every other Saturday. [Entry #54-1 at 4]. Defendant has not disputed Plaintiff's religious convictions, thus, the first element of his prima facie case is satisfied. The second element is likewise satisfied because the parties agree that Plaintiff notified Defendant of his conviction not to work on the Sabbath. [Entry #54-4 at ¶ 6]. With regard to the third element, there is no dispute that Plaintiff was terminated

because he began missing work on Saturdays and accumulated sufficient violations of the attendance control policy to warrant termination. [Entry #1 at ¶ 8; #54-3 at 15].

Because Plaintiff satisfied the elements of a prima facie case of religious discrimination, the burden shifts to Defendant to show it could not reasonably accommodate Plaintiff's religious convictions without undue hardship. At issue are two accommodations: (1) allowing Plaintiff to swap shifts with other employees, and (2) transferring Plaintiff to the position of Inker Rebuilder. [Entry #1 at ¶ 8].[3]

(1)  Reasonableness of Shift-Swapping Accommodation

After Plaintiff was disciplined on March 25, 2005 for violating Defendant's attendance control policy, Defendant reached an agreement wherein Plaintiff would be allowed to swap Saturday shifts with other employees. [Entry #54-3 at 13]. Courts have consistently found that shift-swapping arrangements are a reasonable accommodation where a plaintiff asserts a need to miss scheduled shifts for religious reasons. *See, e.g.*, *Firestone Fibers*, 515 F.3d at 316 ("Firestone allowed its employees to swap shifts up to twice per quarter, for a total of eight times per year. Such an accommodation has also been described as another means of reasonable accommodation."); *Thomas v. Nat'l Ass'n of Letter Carriers*, 225 F.3d 1149, 1156–57 (10th Cir. 2000) (finding that where

_____

[3] During the grievance process, Plaintiff proposed one additional accommodation: permitting him to take single increment vacation days to cover his absences on Saturdays. [Entry #54-4 at 19]. While Defendant addressed the reasonableness of this proposed accommodation in the motion currently before the court, Plaintiff neither raised this proposed accommodation in his EEOC charge nor in his complaint. Furthermore, Plaintiff did not respond to Defendant's contention that the proposed accommodation was unreasonable. The undersigned therefore finds that the proposed accommodation of single increment vacation days is not before the court and declines to address whether such accommodation would have been reasonable in light of the facts alleged in this case.

employer "remained sympathetic to [the plaintiff]'s religious requirements, approved all voluntary schedule swaps that [the plaintiff] was able to arrange, and imposed no restrictions or impediments on [the plaintiff]'s ability to attempt to arrange further voluntary schedule swaps with other employees," employer did "all that Title VII reasonably requires the [employer] to do"); *Brener v. Diagnostic Ctr. Hosp.*, 671 F.2d 141 (5th Cir. 1982) (holding a hospital had no duty to arrange shift swaps between pharmacists to accommodate the religious observance of one of its pharmacists which prohibited work from sundown Friday until sundown Saturday and further holding that permitting the pharmacists to make the shift swaps themselves was sufficient to satisfy the employer's obligation of reasonable accommodation); *see also* 29 C.F.R. § 1605.2(d)(1)(i) (stating that the use of "voluntary swap[s]" constitutes a "[r]easonable accommodation").

Under *Philbrook*, once the burden has shifted to the defendant, the defendant must show either "(1) that it provided the plaintiff with a reasonable accommodation for his or her religious observances *or* (2) that such accommodation was not provided because it would have caused an undue hardship—that is, it would have result[ed] in more than a *de minimis* cost to the employer." *Firestone Fibers*, 515 F.3d at 312 (quoting *Philbrook,* 479 U.S. at 67). Here, Defendant has shown that it provided Plaintiff with an accommodation to which Plaintiff agreed and which has been upheld as reasonable by numerous courts. By negotiating with Plaintiff following his initial suspension, Defendant evidenced a good faith effort to accommodate Plaintiff's religious convictions.

The shift-swapping accommodation was effective from May 2005 until Plaintiff was again disciplined for attendance violations in September 2006. [Entry #54-3 at 13, 15]. Defendant represents that the accommodation stopped working through no fault of Plaintiff or Defendant. [Entry #54-1 at 16]. Rather, employees were no longer willing to trade shifts with Plaintiff. [Entry #54-4 at 4]. Plaintiff's inability to find other employees willing to swap shifts does not render the accommodation unreasonable. *See Miller v. Drennon*, No. 3:89-1466-0, 1991 WL 325291, at *7 (D.S.C. June 13, 1991), *aff'd*, No. 91-2166, 1992 WL 137578 (4th Cir. June 19, 1992) (finding shift-swapping accommodation reasonable even though "plaintiff's latitude to avoid shifts was limited by his ability to find a substitute and by certain minimum staffing requirements").

By permitting Plaintiff to swap shifts with other employees to avoid working on Saturdays, Defendant fulfilled its duty of reasonable accommodation. That the accommodation did not satisfy Plaintiff "is of no consequence." *Miller*, 1991 WL 325291, at *8. The Supreme Court has stated:

> By its very terms the statute directs that *any* reasonable accommodation by the employer is sufficient to meet its accommodation obligation. The employer violates the statute unless it 'demonstrates that [it] is unable to reasonably accommodate . . . an employee's . . . religious observance or practice without undue hardship on the conduct of the employer's business.' 42 U.S.C. § 2000e(j). Thus, where the employer has already reasonably accommodation the employee's religious needs, the statutory inquiry is at an end. The employer need not further show that each of the employee's alternative accommodations would result in undue hardship. As *Hardison* illustrates, the extent of undue hardship on the employer's business is at issue only where the employer claims that it is unable to offer any reasonable accommodation without such hardship. Once the Court of Appeals assumed that the school board had offered to Philbrook a reasonable alternative, it erred by requiring the board to nonetheless demonstrate the hardship of Philbrook's alternatives.

*Philbrook*, 479 U.S. at 68–69.

Because the shift-swapping arrangement at issue here was reasonable, Defendant has satisfied its obligation under Title VII. The undersigned therefore recommends granting Defendant's motion for summary judgment as to Plaintiff's claims related to the shift-swapping accommodation.

(2)     Reasonableness of Job Transfer

Having provided a reasonable accommodation to Plaintiff, it was unnecessary for Defendant to demonstrate the unreasonableness of the alternative accommodations raised by Plaintiff during the grievance process. *Id.* However, because Plaintiff complains that he should have been awarded an alternative position and the arbitrator required Defendant to allow Plaintiff to bid on the position, the undersigned addresses it here for the sake of completeness.

At the first arbitration hearing, the Union proposed Plaintiff be moved to the position of Inker Rebuilder, which would allegedly not require Plaintiff to work on the Sabbath. [Entry #54-5 at 19]. The arbitrator ultimately held that it was a reasonable accommodation to permit Plaintiff to bid on the position when it became available, but that if he was not the senior most qualified person for the position, the accommodation would be void. *Id.* at 39–40. Plaintiff claims the position[4] came open on or about

---

[4] Plaintiff asserts the title of the open position was "Printer Leaderman," but that the original position he was bidding on was "Anchor Rebuild." [Entry #1 at 2]. Because both Defendant and the arbitrator identified the position as "Inker Rebuilder" and Plaintiff failed to substantively respond to Defendant's motion for summary judgment,

March/April 2008. [Entry #1 at 2]. He applied for the position, but was not found to be the senior most qualified candidate for the position and was subsequently terminated. *Id.* at 2–3. Plaintiff further claims the position was given to "a less senior white male in his mid-thirties." *Id.*

Defendant argues that it could not simply transfer Plaintiff to the Inker Rebuilder position because such a transfer would violate Defendant's seniority bidding process. [Entry #54-1 at 21]. Defendant further states that although it allowed Plaintiff to bid on the open position, he was not the senior most qualified bidder. *Id.*

Plaintiff's response to Defendant's motion for summary judgment did not make any substantive arguments related to the Inker Rebuilder position. Plaintiff's complaint simply asserts that the position was given to someone "less senior" and he testified that he disagreed that the person who received the position was more qualified. [Entry #1 at 3; #54-2 at 16].

The undersigned finds that transferring Plaintiff to the open position would have violated the CBA's seniority-bidding process [Entry #54-4 at 6] and would therefore be unreasonable under Title VII. *See Firestone Fibers*, 515 F.3d at 317 (noting that "[i]t is well established that Title VII does not require an employer to violate the terms of a collective bargaining agreement"). The undersigned further finds that Defendant adequately demonstrated that Plaintiff was not the most qualified bidder for the position. The employee chosen for the position, Joey Aldredge ("Aldredge"), worked for

the undersigned refers to the position as "Inker Rebuilder" in this report and recommendation.

approximately 20 years as a Printer Operator, a prerequisite for the Inker Rebuilder Position. [Entry # 54-4 at 7]. In contrast, Plaintiff never held the position of Printer Operator. *Id.* In addition, Aldredge routinely filled in for the incumbent Inker Rebuilder, Shelton Gainey ("Gainey"). *Id.* According to Defendant, Gainey highly recommended Aldredge, but reported that Plaintiff did not have sufficient experience for the position. *Id.*

Plaintiff's opinion that he was more qualified for the position is unavailing. The Fourth Circuit has repeatedly explained that a plaintiff's perception of himself is not relevant. *See DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998); *Evans v. Technologies Applications & Serv. Co.*, 80 F.3d 954, 960–61 (4th Cir. 1996). Furthermore, "Title VII is not a vehicle for substituting the judgment of a court for that of the employer." *Jiminez*, 57 F.3d 369, 377 (4th Cir. 1995). Courts do not sit as "super personnel departments second guessing an employer's perceptions of an employee's qualifications." *Malghan v. Evans*, 118 F. App'x 731, 733 (4th Cir. 2004) (citing *Smith v. Univ. of N. Carolina*, 632 F.2d 316, 346 (4th Cir. 1980)). In fact, "the law does not require an employer to make, in the first instance, employment choices that are wise, rational, or even well-considered, as long as they are nondiscriminatory." *Id.* (citing *Powell v. Syracuse Univ.*, 580 F.2d 1150, 1156–57 (2d Cir. 1978).

Because Defendant has shown that transferring Plaintiff to the position of Inker Rebuilder would have violated the CBA and further shown that Plaintiff was not the senior most qualified bidder for the open position, providing the position to Plaintiff would have placed an undue burden on Defendant. The undersigned therefore finds that

the proposed accommodation was not reasonable and recommends granting Defendant's motion for summary judgment as to Plaintiff's claim of religious discrimination.

### 2. Age and Race Discrimination Claims

Defendant seeks summary judgment on Plaintiff's age and race discrimination claims on the grounds that Plaintiff did not allege age or race discrimination in his SCHAC charge and, therefore, has failed to exhaust administrative remedies. [Entry #54-1 at 26]. Defendant further argues that Plaintiff can provide no evidence that he was treated less favorably than similarly-situated younger or non-minority employees with regard to Defendant's attendance policy. *Id.* at 27–28.

In support of its motion, Defendant attached as an exhibit the SCHAC charge signed under penalty of perjury by Plaintiff on August 15, 2008. [Entry #54-3 at 19]. The charge includes no information suggesting Plaintiff's claim was based on any protected characteristic other than religion. In the section labeled "Discrimination Based On," only the "Religion" box is checked. *Id.* "Age" and "Race" are unmarked. *Id.* The charge also states Plaintiff believes Defendant's actions were discriminatory "based on my religion, Holiness, and in being denied a religious accommodation." *Id.*

A plaintiff's administrative claim "defines the scope of [his] subsequent right to institute a civil suit." *Smith v. First Union Nat. Bank*, 202 F.3d 234, 247 (4th Cir. 2000). "If a plaintiff's claims in [his] judicial complaint are reasonably related to [his] EEOC charge and can be expected to follow from a reasonable administrative investigation, the plaintiff may advance such claims in [his] subsequent suit." *Id.* at 247–48. Fourth Circuit case law has generally precluded a subsequent claim in "formal litigation" where

"the EEOC charge alleges discrimination on one basis, such as race, and the formal litigation claim alleges discrimination on a separate basis, such as sex." *Jones v. Calvert Group, Ltd.*, 551 F.3d 297, 300 (4th Cir. 2009). Without exhausting administrative remedies in a Title VII claim, this court is deprived of subject matter jurisdiction. *Id.* at 300–01.

In the instant case, Plaintiff listed only "religion" as the basis of his charge filed with SCHAC. Thus, he has not administratively exhausted his claims based on age and race discrimination and this court lacks subject matter jurisdiction as to those claims. *See Beane v. Agape Mgmt. Servs., Inc.*, No. 3:08-3445-CMC, 2009 WL 2476629, at *3 (D.S.C. Aug. 11, 2009) (granting motion to dismiss retaliation claim where plaintiff "checked the box for race discrimination in her charge and did not check the box for retaliation"). Therefore, the undersigned recommends Defendant's motion for summary judgment as to Plaintiff's age and race discrimination claims be granted.

### 3. Retaliation

Plaintiff's complaint states, "I am seeking both compensatory and punitive damages in this case as I have also alleged retaliation." [Entry #1 at 1]. Plaintiff pled no facts in support of a retaliation claim and Defendant made no arguments related to such a claim; however, to the extent the complaint may be read to assert a retaliation claim, Plaintiff has failed to make a prima facie showing of the required elements.

Title VII's retaliation provision forbids "an employer to discriminate against any of his employees . . . because [the employee] has opposed any practice made an unlawful employment practice." 42 U.S .C. § 2000e–3(a). To establish a prima facie claim for

retaliation, Plaintiff must prove that: (1) he engaged in protected activity; (2) an adverse action was taken against him; and (3) Defendant took the adverse action because of his protected activity. *Ross v. Commc'ns Satellite Corp.*, 759 F.2d 355, 365 (4th Cir. 1985). If Plaintiff satisfies the prima facie case, the burden of production shifts to Defendant to articulate a legitimate, nondiscriminatory reason for the action. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 311 (1996). After Defendant meets this burden, Plaintiff must prove that Defendant's proffered reason is pretext for retaliation. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507–08 (1993).

Plaintiff received notice of Defendant's intent to terminate him prior to filing his grievance and EEOC charge. Thus, the adverse action occurred prior to Plaintiff engaging in any arguably protected activity and he cannot establish the causal connection necessary to support a claim for retaliation. To the extent Plaintiff contends the adverse action was Defendant not selecting him for the position of Inker Rebuilder, Defendant has articulated a legitimate, nondiscriminatory reason for not selecting Plaintiff—he was not the senior most qualified bidder for the position. Plaintiff has not provided the court with any evidence to show the legitimate, nondiscriminatory reason stated by Defendant was pretextual. Consequently, Plaintiff has not established a prima facie claim of retaliation and, to the extent his complaint asserts such a claim, the undersigned recommends the claim be dismissed.

III. Conclusion and Recommendation

For the foregoing reasons, the undersigned recommends Defendant's motion for summary judgment [Entry #54] be granted.

IT IS SO RECOMMENDED.

April 18, 2012                              Shiva V. Hodges
Columbia, South Carolina                    United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).